# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

ALEX ROSINSKY[1]
By his legal guardian Julie Rosinsky,

        Plaintiff,

     v.                                              Case No. 08-C-976

GREEN BAY AREA SCHOOL DISTRICT,

        Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Alex Rosinsky, through his mother and legal guardian Julie Rosinsky, seeks judicial review of the September 23, 2008, decision of Administrative Law Judge ("ALJ") Sally Pederson of the Wisconsin Division of Hearings and Appeals, following a due process hearing under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., and its Wisconsin equivalent, Wis. Stat. § 115.758 *et seq*. ALJ Pederson found that the Green Bay Area School District ("the District") complied with federal and state special education law regarding Alex's evaluation, individualized education program ("IEP") team participation, IEP development and implementation, transition programming, and educational placement. ALJ Peterson also determined that the District repeatedly provided the required prior written notice to Ms. Rosinsky. While the ALJ did find that the District provided insufficient notice on one occasion, she concluded

---

[1]While the Court normally redacts the last names of children, in this case Alex Rosinsky had already reached the age of majority by the time this action was brought, so his surname has not been redacted.

that the singular procedural defect did not result in a substantive violation of the IDEA. Plaintiff filed a petition for review of the ALJ's decision in the Circuit Court for Brown County and the District removed the case to federal court on November 13, 2008. (Doc. # 1.) In the amended complaint filed on February 6, 2009, plaintiff alleges that the ALJ made improper evidentiary rulings, erroneous factual determinations and misapplied the IDEA. (Doc. # 12 at 18-19.) The District moved for summary judgment. (Doc. # 15.) For the reasons stated below, the District's motion will be granted.

## BACKGROUND

Alex Rosinsky was medically diagnosed with Fragile X syndrome.[2] (Decision of Administrative Law Judge Sally Pederson, dated September 23, 2008, hereinafter "Decision," at 3.) The District determined that Alex met the eligibility criteria for other health impairment ("OHI"), cognitive disability, and speech and language disability. (*Id*.) At the start of the 2007-2008 school year, an IEP was in effect for Alex. (*Id*.) There were four meetings regarding the IEP in 2007, occurring on May 31, November 20, December 6 and December 11. (*Id*. at 3-5.) The IEP from the May 31, 2007 meeting contained three goals for Alex, which related to the following: (1) his asking for assistance with tasks at job sites and with job tasks in school with no prompts; (2) increasing his employability skills to a more independent level with fewer prompts; and (3) increasing his independence in the community in a variety of settings such as stores, restaurants and recreational

---

[2] Fragile X syndrome is the most common form of inherited mental impairment, which can range from learning disabilities to more severe cognitive or intellectual disabilities. *See* http://www.fragilex.org/html/what.htm (last accessed August 20, 2009).

2

facilities with fewer prompts. (*Id*. at 3.) At the request of Ms. Rosinsky, the District conducted a special education reevaluation of Alex during the fall of the 2007-2008 school year. (*Id.* at 4.)

## November 2007 IEP Meeting

On November 20, 2007, the District held an IEP meeting for the purpose of reevaluation and determining Alex's eligibility, which Ms. Rosinsky attended. (*Id*.) Ms. Rosinsky participated in the meeting by raising concerns, asking questions and providing input. (*Id*.) Prior to the meeting, Ms. Rosinsky requested that an IEP facilitator attend and participate, which the District did arrange for at the November IEP meeting and the two IEP meetings in December. (*Id*.) The District did not invite to the November IEP meeting Alex's case workers from Brown County and the Wisconsin Division of Vocational Rehabilitation ("DVR"), as the meeting was not called to develop or revise Alex's IEP and transition program. (*Id*.) Ms. Rosinsky did invite both case workers, however, and both did attend the November meeting. (*Id*.) After the meeting, Ms. Rosinsky provided the District written consent to allow it to invite Alex's case workers from Brown County and the DVR to future IEP meetings. (*Id*.; Hearing Ex. 35) As a result of the November 20 IEP meeting, the IEP team determined that it would convene another meeting on December 6 to develop a transition statement and annual IEP for Alex. (Decision at 4.)

## IEP Meetings in December 2007

The IEP meeting on December 6 lasted three hours. (Hearing Ex. 7.) Ms. Rosinsky again attended and participated. (Decision at 4.) Also in attendance, among others, was the third-party IEP facilitator and Alex's Brown County case worker, Julie Stoltenow, though his DVR case

3

worker, Steve Chronquist, did not attend. (*Id*.) Alex's two case workers did not receive written invitations from the District for the December 6 meeting. (*Id*.) The IEP team concluded at the end of the meeting that it would hold another meeting on December 11 to continue developing Alex's IEP and transition statement. (*Id*. at 5.)

The December 11, 2007 IEP meeting lasted five hours. (Hearing Ex. 7.) Ms. Rosinsky and the IEP facilitator attended, but Alex's DVR case worker did not. (Decision at 5.) The county and DVR case workers were sent written invitations by the District and both were aware of the meeting as they were in attendance at the meeting on December 6, where the December 11 meeting was announced.[3] (*Id*.)

At the IEP meetings in December Ms. Rosinsky initially requested that Alex's IEP include 15 to 20 hours per week of work time in the community, though after discussing this request with the IEP facilitator she amended her request to 10 to 15 hours of the same. (*Id*.; Tr. 19-20.) The December IEP contained the following notes relating to this request in the "Determination and Notice of Continued Placement" section of the IEP:

> Parent request for 10-15 hours of work time per week in community. Rejected as an absolute amount as school staff feel focus needs to be on variety of job skills learned, quality and completeness of work without prompts, and extending work time between breaks.

(Hearing Ex. 1 at 5-66.) The notice did not refer to a request for 15 to 20 hours per week of work time.

Ms. Rosinsky also requested that the District contract with a community service provider. This request was rejected in the IEP with the following notes: "Parent request district contract

---

[3]The District mailed the county case worker's invitation to the wrong address, so she did not receive it until after the December 11 meeting.

4

community service provider for community activities. Rejected as district programming can adequately provide community activities." (*Id*.) The written notice in the IEP did not specifically refer to the District contracting with a community service provider for services two or three times per week.

The Determination and Notice of Continued Placement page of the December IEP did not contain a description of evaluation procedures, assessments, records or reports that were used as a basis of refusing the requests. (*Id*.) The District provided Ms. Rosinsky a copy of the December IEP on December 21, 2007, along with a copy of the parent/student procedural safeguard rights. (Decision at 5.)

**Events Subsequent to the December IEP Meetings**

On December 19, 2007, Ms. Rosinsky wrote to the District and requested a meeting to discuss a behavior intervention plan ("BIP") for Alex. (*Id*. at 6; Hearing Ex. 36.) The next day Ms. Rosinsky wrote the district again and requested another IEP meeting to discuss goals and placement for Alex in the 2007-2008 school year. (Decision at 6; Hearing Ex. 6.) On January 3, 2008, the District responded to Ms. Rosinsky's request that it convene another IEP meeting to discuss Alex's goals and placement. The District refused her request on the basis that the IEP team had met for eight hours in December for "comprehensive drafting of Alex's IEP." (Hearing Ex. 7.) The District further noted that the IEP facilitator had assisted at the December meetings. This written notice did not refer to Ms. Rosinsky's request for a BIP. The Wisconsin Department of Public Instruction investigated a complaint against the District regarding plaintiff's request for another IEP team meeting and concluded that the District properly responded to the request. (Hearing Ex. 32.)

5

The goals of Alex's December IEP were implemented on January 2, 2008. (Decision at 6.) The first semester of the 2007-2008 school year ended 12 school days later, and Alex's special education teacher completed the progress report on January 18, 2008. As the new goals had been in effect for only a short period of time, the report was based on Alex's progress toward the goals that had been outlined in the previous IEP. (*Id*.) On June 9, 2008, another report of Alex's progress was made, this time based upon the goals established in the December 2007 IEP. (*Id*.)

Both IEPs that were in effect during the 2007-2008 school year contained transition service statements that included suggested courses of study, instruction, employment, post-school adult living, daily living, community experiences, functional vocational assessment, and related services. The transition plans also contained post-secondary goals. (Decision at 7.) For example, in the December IEP, the post secondary goal stated is that Alex "will be able to hold a 15-20 hour-per-week part-time supported employment job in a community setting utilizing his strengths, such as categorizing or sorting skills, and have limited customer interactions." (Hearing Ex. 1 at 5-59.) Alex's transition program and placement for 2007-2008 provided that in addition to attending West High School he would work at job sites in the community four or five times per week, including paid jobs, and would be involved in daily living, community and recreational/leisure activities, and vocational experiences in the community. (*Id*.) While in school, Alex worked on daily life skills, in addition to receiving occupational therapy and attending elective courses. (Decision at 7.)

## ANALYSIS

### I. Standard of Review

Although this matter is before me on the District's motion for summary judgment, the standard of review in this IDEA case "differs from that governing the typical review of summary

6

judgment." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir. 1997); *see also Bd. of Educ. v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007) (drawing a distinction between "the ordinary standard for summary judgment" and "the special IDEA variant"); *Alex R. v. Forrestville Valley Cmty. Unity Sch. Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004) ("the term 'summary judgment' in the context of an IDEA case has a different meaning than it has in a typical Rule 56 motion."), *cert. denied*, 543 U.S. 1009 (2004). Under the IDEA, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S.*, 125 F.3d at 1052 (quoting *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994), *cert. denied,* 513 U.S. 839 (1994)). Summary judgment in IDEA cases "has been deemed appropriate even when facts are in dispute, and is based upon a preponderance of the evidence." *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th Cir. 2002) (citations omitted), *cert. denied*, 537 U.S. 948 (2002).

Whether the District has satisfied the requirements of the IDEA is a mixed question of law and fact. *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994). On pure issues of law, the ALJ is entitled to no deference. *Dale M. ex rel. Alice M. v. Board of Educ.*, 237 F.3d 813, 817 (7th Cir. 2001) (citation omitted), *cert. denied*, 534 U.S. 1020 (2002). On issues of fact, however, the district court must accord "due weight" to the ALJ's decision. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). The party challenging the ALJ's factual findings bears the burden of proof. *Heather S.*, 125 F.3d at 1052 (citation omitted).

In deciding whether the challenging party meets that burden, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such

7

relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "[W]here the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.' This level of review is akin to the standards of clear error or substantial evidence." *Alex R*., 375 F.3d at 611-612 (quoting *School Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)).

## II. The IDEA

The IDEA requires that the District, as a recipient of federal education funds, provide children with disabilities a free appropriate public education ("FAPE") in the least restrictive environment. 20 U.S.C. § 1412(a). A FAPE is an education that is "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Murphysboro*, 41 F.3d at 1166 (quoting *Rowley*, 458 U.S. at 188-89). While "the purpose of the IDEA is to 'open the door of public education' to handicapped children," the District is not required to "educate a handicapped child to her highest potential." *Id.* (quoting *Bd. of Educ. of Sch. Dist. No. 21 v. Ill. St. Bd. of Educ.*, 938 F.2d 712, 715 (7th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992)).

The development and implementation of an IEP plays a key role in achieving the objectives of the IDEA. "The IDEA requires that the state determine what is uniquely "appropriate" for each child's education by preparing an IEP developed through the joint participation of the local education agency, the teacher, and the parents." *Hjortness ex rel. Hjortness v. Neenah Joint School Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2962 (2008). The statute defines

8

an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [section 1414(d)]. . . ." 20 U.S.C. § 1401(14).

A court reviewing an IEP under the IDEA must consider whether "(1) the school district followed the IDEA's procedures and (2) the IEP is "reasonably calculated to enable the child to receive educational benefits [i.e., to receive a FAPE]." *Alex R.*, 375 F.3d at 613. In other words, the IDEA places upon the District a substantive obligation and a procedural obligation, *see Hjortness*, 507 F.3d at 1064 (citation omitted), though procedural shortcomings alone will only entitle an IDEA plaintiff to relief when procedural error results in the loss of educational opportunity. *Heather S.*, 125 F.3d at 1059; *see also Hjortness*, 507 F.3d at 1065 ("Procedural flaws do not require a finding of a denial of a free appropriate public education. However, procedural inadequacies that result in the loss of educational opportunity result in the denial of a free appropriate public education.") (citation omitted).

Plaintiff asserts that Alex's IEP was flawed both procedurally and substantively. Her allegations of procedural error include claims that (1) the District violated Alex's procedural rights by failing to provide prior written notice of changes to Alex's educational program and its denial of suggested changes to Alex's educational program, and (2) the District failed to invite and/or include Ms. Rosinsky and Alex's case workers to meaningfully participate in the development of his IEPs. Plaintiff also alleges that the IEP was substantively deficient, resulting in Alex being denied a FAPE of more than minimal educational benefit.

## III. Plaintiff's Motion for Leave to Supplement the Administrative Record and Discovery

Before turning to the specific defects alleged by Plaintiff, it is first necessary to address her motion for leave to conduct discovery regarding the District's use of the Wisconsin Extended Grade

9

Band Standards ("WEGBS"), to depose one of the district's witnesses, and to supplement the record with information obtained by such discovery and with Alex's December 2008 IEP. (Doc. # 21.) Plaintiff seeks this information regarding the adequacy of Alex's reevaluation in 2007 and whether he was supplied a FAPE of more than minimal educational benefit.

In reviewing administrative proceedings under the IDEA, district courts consider the records of the administrative proceedings and "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C). Even though the statute appears to make the hearing of additional evidence mandatory, the courts have construed the statute to grant district courts discretion to hear additional evidence. *Ross*, 486 F.3d at 270; *Monticello Sch. Dist. v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996) ("A district court is not required to allow all evidence proffered by a plaintiff in an IDEA proceeding. . . . [T]he determination of whether to allow additional evidence under § 1415(e)(2) 'must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*.'") (quoting *Town of Burlington v. Dep't. of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd on other grounds sub nom.*, *Burlington Sch. Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359 (1985)).

Judge Adelman has observed that "courts have not applied a uniform standard" in determining whether to receive additional evidence. *Konkel v. Elmbrook Sch. Dist.*, 348 F. Supp. 2d 1018, 1020 (E.D. Wis. 2004). The court in *Konkel* formulated the following standard based upon its reading of the Seventh Circuit's statements in *Monticello* and the policy reasons identified by the First Circuit in *Burlington*:

> [A] court should receive additional evidence at the judicial review stage of an IDEA proceeding only if the movant provides a particularized and compelling justification for doing so. This showing should include an explanation both as to why the

10

evidence was not presented at the administrative level and why it is probative of the issues before the court.

348 F. Supp. 2d at 1022. As noted above, when the district court hears evidence not presented at the administrative proceedings, less deference is owed to the decision of the ALJ. *See Alex R.*, 375 F.3d at 612 (sliding scale of level of deference owed to administrative proceedings based upon whether new evidence received; in no case is it a *de novo* trial).

Plaintiff has failed to provide sufficient justification for the Court to receive additional evidence in this judicial review of the administrative proceedings. Much of plaintiff's argument in support of her motion to take more discovery is framed in terms of Rule 56(f) of the Federal Rules of Civil Procedure and her desire to gather information sufficient to raise a genuine issue of material fact. The problem with this argument is that the summary judgment standard is different in the context of a judicial review of administrative proceedings under the IDEA than in an ordinary civil action. While a Rule 56(f) protects a party that can show "it cannot present facts essential to justify its opposition" to the motion for summary judgment, a motion for summary judgment in a review proceeding under the IDEA is not a contest over whether there is an absence of any genuine issue of material fact warranting judgment as a matter of law, as "there is no right to trial in a review proceeding." *Heather S. v. State of Wis.*, 937 F. Supp. 824, 829 (E.D. Wis. 1996), *aff'd*, 125 F.3d 1045 (7th Cir. 1997). Plaintiff's insistence that she be permitted to conduct additional discovery in order to gather information to raise a genuine issue of material fact is misplaced.[4] In essence, her

---

[4]The Court suspects that plaintiff's efforts at warding off a grant of summary judgment in favor of the District by demonstrating the existence of a genuine issue of material fact is one reason plaintiff found objectionable so many of the District's proposed findings of fact. While the local rules certainly endorse the parties submitting proposed findings of fact on a motion for summary judgment, *see* Civil L.R. 56.2, one wonders what role such an undertaking serves in the context of a judicial review of an administrative record, where the parties do not inform the Court of the facts

motion is an effort to change the character of the hearing from one of review to a trial *de novo*, precisely what *Monticello School District v. George L.*, 102 F.3d at 901, expressly cautioned against.

Plaintiff claims she should be allowed to conduct a deposition of Dr. Barbara Van Haren, who offered expert opinion testimony regarding various matters, including the adequacy of Plaintiff's IEP in supporting Plaintiff's post-secondary goals. Plaintiff points to what she believes to be a gap in Dr. Van Horn's testimony. It appears Plaintiff seeks to conduct the cross-examination of Dr. Van Horn that Plaintiff failed to conduct during the hearing. This is not a proper ground to conduct additional discovery. *See Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 667 (4th Cir.1998) ("A lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming, as parties scrambled to use the federal court proceeding to patch up holes in their administrative case.")

Plaintiff also requests that the Court consider the WEGBS and Alex's December 2008 IEP, which apparently incorporated the WEGBS.[5] This information was not considered by the ALJ, and plaintiff argues the ALJ erred in not granting her request to admit the WEGBS at the hearing. The WEGBS, which were adopted by the State of Wisconsin to guide instruction and curriculum planning for students with significant cognitive disabilities, set standards of what such students are

_____

as developed in discovery but simply provide the Court the record of the proceedings below. Exchanges of proposed factual findings and responses to the same in the context of a review such as this seem to add an unnecessary layer to the process.

[5]The WEGBS guide instruction and curriculum planning in Reading, Mathematics and Science for students with significant cognitive disabilities, and set knowledge and performance standards in these areas. *See* http://dpi.wi.gov/sped/assmt-extstd.html (last accessed August 28, 2009). The WEGBS are discussed in more detail below.

expected to know and be capable of doing.[6]  The standards provide a means of assigning performance levels of advanced, proficient, basic or minimal in the areas of reading, mathematics, and science.  The District had apparently not yet implemented the WEGBS at the time Alex's 2007 IEP was prepared.

Plaintiff asserts that consideration of the District's current use of the WEGBS is relevant to the question of whether the District appropriately evaluated Alex in developing his IEP and monitoring his progress.  Her argument appears to be that since the District began using the WEGBS in Alex's IEP sometime after the due process hearing, Alex's previous non-WEGBS evaluations were flawed due to the use of "inappropriate testing methodologies," which in turn would mean that Alex's IEP was developed with inaccurate data.

I conclude that the WEGBS are irrelevant on the question of whether the ALJ correctly concluded that Alex received a FAPE of more than minimal educational benefit in 2007-2008.  While the WEGBS may now be a tool available to school districts in evaluating students with significant cognitive disabilities, they did not dictate any content in Alex's IEPs for 2007-2008.  Further, plaintiff has failed to demonstrate how the WEGBS are relevant to the question of whether the ALJ correctly concluded that Alex received that to which he was entitled under the IDEA.  It does not follow that because the District later adopted the WEGBS in evaluating Alex its previous methods of evaluation are suspect.  To hold otherwise would discourage school districts from ever adopting a new evaluation systems under a fear that it will be viewed as an admission that the incumbent evaluation system was defective.  As the WEGBS were not part of Alex's IEP, the ALJ

---

[6] The Department of Education has promulgated regulations that require states to develop challenging academic content and academic achievement standards for the disadvantages.  *See* 34 C.F.R. § 200.1 *et seq.*

13

did not have any reason to consider Alex's progress in light of the WEGBS. I see no reason to consider the WEGBS in this review either.

## IV. ALLEGED PROCEDURAL AND SUBSTANTIVE DEFECTS

### A. Written Notice

Plaintiff identifies three procedural claims of inadequate prior notice. First, she alleges that the District failed to provide appropriate prior written notice regarding its denial of her requests for 15-20 hours per week of vocational training and placement in a community services provider. The second alleged insufficient notice relates to Ms. Rosinsky's request for a meeting to discuss a behavior intervention plan ("BIP") for Alex after he became overly agitated at school and injured himself. Plaintiff also claims that the District failed to provide notice regarding Alex's second semester electives in the 2007-2008 school year and his participation in personal fitness.

The IDEA requires that the District provide the parents of a disabled child prior written notice whenever the District proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child. 20 U.S.C. § 1415(b)(3). The statute mandates that this prior written notice include (1) a description of the action proposed or refused; (2) an explanation of why the District proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the District used as a basis for the proposed or refused action; (3) a statement that the parents of a child with a disability have protection under the procedural safeguards of the IDEA and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained; (4) sources for parents to contact to obtain assistance in

14

understanding the provisions of the IDEA; (5) a description of other options considered by the IEP Team and the reason why those options were rejected; and (6) a description of the factors that are relevant to the District's proposal or refusal. 20 U.S.C. § 1415(c)(1).

**1. Vocational Training and Placement with Community Service Provider**

The ALJ found that the District provided appropriate written notice to Ms. Rosinsky regarding its denial of her request for 15-20 hours per week of vocational training and placement at ASPIRO, a community service provider with which the District contracts. (Decision at 17.) Ms. Rosinsky initially requested 15 to 20 hours per week of vocational training, but later amended her request during one of the December 2007 IEP meetings to 10 to 15 hours per week of the same. This request was considered by the District and denied in writing on the December 2007 IEP in terms of the request for 10 to 15 hours per week of vocational training. The ALJ reasoned that it was "obvious and logical" that if the District refused to provide 10 to 15 hours of vocational training per week, it also refused to provide 15 to 20 hours of such training. (Decision at 9.) I find the ALJ's reasoning sound and conclude that plaintiff's claim regarding vocational training is without merit.

Regarding the request that Alex be placed with a community service provider, the ALJ observed that the District provided written notice that it refused to provide such a service. The ALJ found this notice sufficient, even though the written refusal did not specifically mention that Ms. Rosinsky had requested community services two or three times per week. Plaintiff contends that the ALJ's decision is in error, as the written notice contained in the December IEP did not contain all of the information required by 20 U.S.C. § 1415(c)(1). Further, plaintiff argues that because the ALJ ruled that the allegedly defective notice was not a procedural violation of the IDEA, and made

15

no specific findings as to whether the District's failure to provide written notice constituted a violation of Alex's substantive rights, the decision amounted to a substantive denial of Alex's rights under the IDEA.

I disagree. Even though the District concedes that the prior written notice did not contain a description of the evaluation procedures, assessments, records, or reports or other factors upon which it made its decision, this was because the District did not base its refusal on these factors and information, and no other such information was relevant. Timothy Gantz, Associate Director of Special Education at the District, testified at the hearing that the District does not always send out evaluation reports and tests with every written notice where such information was not part of the determination. (Tr. 216.) There is nothing in the record to suggest that the District relied on information it should have included in the written notice regarding its decision to deny Alex the opportunity to be placed with a community service provider. Further, even if there were some indication that this was the case there is nothing before me to suggest that such a failing would result in the loss of educational opportunity so as to amount to a denial of a FAPE under the IDEA. In sum, I find no reason to disturb the ALJ's determination that the District did not commit a procedural violation of the IDEA in denying the request for 10-20 hours of vocational training and placement with a community service provider.

## 2. Request for a Behavior Intervention Plan

On December 19, 2007, Ms. Rosinsky requested a meeting to discuss a BIP for Alex, claiming Alex was agitated at school. (Hearing Ex. 36.) The District responded with a notice dated January 3, 2008, in which it indicated her request would be denied, though it did not indicate what exactly it was denying. (Hearing Ex. 7.) The ALJ noted this deficiency and concluded that although

16

the District failed to provide prior written notice of the action refused as required by 20 U.S.C. § 1415(c)(1), the record did not support a finding that this procedural violation denied Alex meaningful participation in the IEP process or resulted in a loss of educational benefit to him. (Decision at 9.) In reaching this conclusion, the ALJ reasoned that only eight days prior to making her request Ms. Rosinsky had participated in hours of IEP meetings for Alex, which included a determination that Alex's behavior did not impede his learning or that of others.

Ms. Rosinsky contends that the ALJ's analysis is flawed for the following reasons: (1) her request and the incident which prompted it occurred after the December IEP meeting, making it impossible for the behavior which caused her concern to have been considered at the meeting; and (2) she presented evidence that Alex's behavioral issues continued into the 2008-2009 school year, which is at odds with the ALJ's finding that "there is no indication that the Student exhibited behavior problems that warranted a BIP during the 2008-09 school year or that the District's failure to discuss a BIP for the Student resulted in a denial of FAPE." (*Id.*)

While plaintiff is correct to observe that the request for a meeting to inquire about a BIP for Alex occurred after the December 2007 IEP meetings, it does not follow that the ALJ was wrong to find that this procedural infraction did not deprive Alex meaningful participation in the IEP process or result in a loss of educational benefit. Ms. Rosinsky had been actively involved in four different IEP meetings in 2007, and there is no evidence that she did not understand to which of her requests the denial referred, so as to frustrate her ability to seek further review of the decision. Although plaintiff does point to a letter from Alex's doctor referring to Alex's difficulties in the school setting "[o]ver the last number of years," (Hearing Ex. 60), and her own testimony regarding her concerns, there is insufficient evidence in the record to conclude that the ALJ's determination

17

that "there is no indication that the Student exhibited behavior problems that warranted a BIP during the 2008-2009 [sic] school year . . ." was clearly erroneous. The ALJ did not find that Alex was without behavior problems during the 2007-2008 school year, but that such problems he did exhibit did not warrant a BIP.

### 3. Second Semester Electives and Alleged Discontinuation of Personal Fitness Class

The two remaining instances in which plaintiff claims the District failed to provide prior written notice relate to Alex's placement in second semester electives and the discontinuation of his fitness class elective in May 2008. The ALJ determined that no written notice was wanting, as she found that the District did not unilaterally place Alex in second semester elective courses and did not discontinue his personal fitness class in May 2008.

Plaintiff's attack on the ALJ's determination is twofold, as she argues the record does not support the ALJ's factual findings and that the ALJ erroneously concluded that Alex's placement in second semester electives and discontinued participation in personal fitness did not result in a change in his educational placement or in the provision of a FAPE. In support of her contention that the record does not support the ALJ's factual findings, plaintiff claims the record supports the following: (1) Ms. Rosinsky testified that she was given no choice as to Alex's second semester electives; (2) Alex's teacher testified that although there were various elective choices available they were not forwarded to Ms. Rosinsky for consideration; and (3) that Alex did not attend his personal fitness elective class in May. I will first address plaintiff's claims regarding the electives before turning to the District's alleged unilateral cancellation of the fitness class.

### a. Electives for First, Seventh and Eighth Period

At the due process hearing, Ms. Rosinsky testified that she agreed with Alex's teacher that

18

"Tech Ed" would be a "good choice" for Alex's seventh hour class, but only because she "was not given another choice to choose from." (Tr. 209-10.) In a communication log between Alex's teacher and Ms. Rosinsky, the two discussed Tech Ed as a seventh period class choice. (Hearing Ex. 24.) Ms. Rosinsky inquired whether Alex would be staying in Tech Ed for seventh period. In response, Alex's teacher wrote, "yes, if that's ok with you, good group, Alex shows interest in tools." (*Id*.) Ms. Rosinsky asked if there were any other choices available for Alex during seventh period, to which his teacher responded that there were, but "Tech Ed looks like best option." (*Id*.) The teacher further noted: "I can look for other 7th hour classes, but the Adaptive Tech Ed is a good choice for him, I think he likes the tools. Let me know what you think." (*Id*.) To this Ms. Rosinsky wrote in the margin: "yes he does we keep him away from power tools @ home." (*Id*.) Based upon this record, I cannot conclude that the ALJ's finding that Alex's preferences were taken into account and his mother's input obtained in selecting his seventh period class was erroneous.

This leaves the question of how Alex's first and eighth hour electives were selected. The record reveals that because Alex was spending four mornings a week working at various community service organizations, his first hour elective choice only applied to Fridays. (*Id*.) Alex's teacher asked him whether he preferred Music or Physical Education for his first period class on Fridays and Alex said he preferred Music. (Hearing Ex. 53.) She then wrote a note to Ms. Roskinsky in the communication log asking her whether Music was an acceptable choice for his first period class on Fridays, though there is no indication that Ms. Rosinsky ever responded in the log. (*Id.*) Ms. Rosinsky testified that although Alex did not have an interest in Physical Education, she chose it, though only by "default," as there was no other choice. (Tr. 384-85.) Alex's teacher presented Ms. Rosinsky with two options for Alex's eighth period class: Life Skills, a vocational class, and

19

Personal Fitness. (Hearing Ex. 23.) In her testimony Ms. Rosinsky indicated that because Life Skills is not an elective, but a functional academic course, her only choice was to select the Personal Fitness class for Alex. (Tr. 384-85.)

Given the above exchanges between Alex's teacher and Ms. Rosinsky, I also find no reason to upset the ALJ's determination that the teacher took Alex's preferences into account and obtained Ms. Rosinsky's input in scheduling Alex's second semester electives for the first period classes on Fridays and eighth period classes everyday. What the record demonstrates is that Ms. Rosinsky was consulted regarding the scheduling of Alex's classes during these two periods, and while she may not be happy with limited options she was presented, I cannot conclude on the record before me that there was no prior written notice regarding these changes. Even if notice were lacking, it is unclear that these modifications in the schedule would constitute a change in educational placement sufficient to trigger the IDEA's prior notice requirements.

### b. Discontinuation of Personal Fitness Class

Plaintiff maintains that, contrary to the ALJ's factual finding, the District unilaterally discontinued Alex's personal fitness elective in May 2008 and that the District provided no prior written notice. Plaintiff points to the fact that Alex did not attend the personal fitness elective in May and that he did not receive a grade for the course that quarter. (Hearing Exs. 9-10.)

The record reflects the fact that Ms. Rosinsky was consulted regarding modifying Alex's activities during eighth period, that Alex himself indicated he did not want to participate in the fitness class on various days and that there were other reasons why Alex did not participate in the class during eighth period. Alex's teacher testified that Alex's county case worker expressed concerns to her in late April 2008 about Alex being upset at home. (Tr. 339-40.) This prompted

20

his teacher to consider ways to calm Alex at the end of the school day and propose two courses of action to Ms. Rosinsky: going on a walk with Alex in lieu of his eighth period fitness class and providing Alex more down time during eighth period. (Tr. 340-41; Hearing Ex. 50.) Ms. Rosinsky indicated to Alex's teacher that she did not want him to walk instead of attending fitness class, but that she wanted Alex to have more down time during eighth hour. (Tr. 341.) Further, based upon the document created by Ms. Rosinsky tracking Alex's daily activities for the month of May, it appears that on several occasions the reason Alex did not participate in fitness class was that he did not want to. (Hearing Ex. 9.) For example, on the entry for May 15, it indicates "No phy ed - Asked if Alex wanted computer or Gym outside and he chose computer and looked at photos." (*Id*.) On other days in May it appears that Alex did not participate in the class due to the fact he returned late from his work at St. Vincent DePaul's. Plaintiff's evidence regarding the fact Alex did not participate in the class in May coupled with the fact he did not receive a grade in the course is insufficient to overturn the ALJ's factual finding that the District did not discontinue his personal fitness class in May 2008.

### B. Invitation of IEP Meeting Participants

As I have concluded that the ALJ appropriately found either that the District did not fail to give prior written notice, or where it did make such procedural error it did not amount to a substantive violation of the IDEA, I now turn to plaintiff's other allegation of procedural error, that the District failed to invite all of the necessary participants for Alex's IEP meetings. Plaintiff alleges that the District failed to invite Alex's state and county case workers to the November 20 and December 6 IEP meetings, and that the District did not send timely notification to Alex's county case worker for the December 11 meeting. She contends that because these meetings involved, at

21

least in part, Alex's transition programming and Alex's IEPs from the 2007-2008 school year identified Alex's county case worker Julie Stoltenow and his DVR case worker Steve Chronquist as members of his IEP team, the District's failure to issue invitations resulted in a substantive denial of Alex's rights under the IDEA.

The record reflects that the District did not invite Stoltenow or Chronquist to the November 20 or December 6 meetings. Ms. Rosinsky nevertheless invited both Stoltenow and Chronquist to the November 20 meeting and the December 6 meeting was announced at the November 20 meeting. Stoltenow attended both meetings, but Chronquist did not attend the meeting on December 6. The District mailed written notice to both Stoltenow and Chronquist regarding the December 11 meeting, but it sent Stoletenow's invitation to the wrong address, resulting in her invitation arriving two days after the meeting occurred. Stoltenow attended anyway, having attended the December 6 meeting where the December 11 meeting was scheduled. In sum, both of Alex's workers attended the November 20 IEP meeting, but only Stoltenow attended the two meetings in December. Chronquist had notice of both December meetings by virtue of his presence at the November 20 meeting (at which the December 6 meeting was announced) and the fact the District mailed him an invitation to the meeting on December 11.[7]

The IDEA requires the following participants be present at each IEP team meeting: the student's parents, at least one of the student's regular education teachers, at least one of the student's special education teachers or special education providers, a qualified and knowledgeable representative of the District, and someone who can interpret the instructional implications of any

---

[7]Plaintiff contends that the announcement made at the November 20 IEP meeting regarding the December 11 meeting was only tentative, as it was not until the December 6 meeting that the December 11 meeting was set. (Rosinsky Aff. ¶ 8.)

evaluation. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321. Whenever it is appropriate the student may attend, 20 U.S.C. § 1414(d)(1)(B)(vii), and "at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate . . . ." 20 U.S.C. § 1414(d)(1)(B)(vi). Regarding this category, the regulation contemplates participation by "transition services participants" as follows:

> To the extent appropriate, with the consent of the parents or a child who has reached the age of majority . . . the public agency must invite a representative of any participating agency that is likely to be responsible for providing or paying for transition services.

34 C.F.R. § 300.321(b)(3).

As Stoltenow attended all three of Alex's IEP meetings in November and December, even if the District were required to invite her to the meetings and did not, such a procedural violation did not amount to a substantive denial of a FAPE. This leaves the question of whether the District's failure to invite Chronquist, who did not attend all of the meetings, was a procedural violation which had the effect of denying Alex a FAPE. The ALJ concluded that Ms. Rosinsky had not met her burden of showing that the District failed to invite or include all of the necessary participants in IEP meetings. Nothing in 20 U.S.C. § 1414(d)(1)(B) requires the participation of a student's case workers, and the regulation's mandatory language regarding the District's duty to invite "transition services participants" is qualified by language such as "[t]o the extent appropriate." 34 C.F.R. § 300.321(b)(3). Further, the "Transition Services" section of the IEP developed in the December meetings anticipated the future services to be offered to Alex by other agencies, with a note that

> Julie Stoltenow from Brown County Human Services anticipates services for Alex would start at 21, after high school services end. Steve Chronquist from DVR anticipates that services for Alex start at 20-21, becoming more involved in Alex's

23

last year of service in the high school. Both would like to be invited to all future IEP meetings.

(Hearing Ex. 1 at 5-59.) The record demonstrates that although Chronquist was not present at the December IEP meetings, he was able to relay his thoughts about the future provision of transition services to Alex through someone, perhaps Stoltenow or Alex's mother. In any event, given the qualified nature of the obligation placed on the District to invite transition services participants and the fact that Chronquist was otherwise involved in planning for Alex's future despite his lack of attendance at the December meetings, I find no basis to disrupt the ALJ's conclusion that the District's failure to invite or include Alex's case workers did not result in a substantive denial of a FAPE.

### C. Parent's Participation in IEP Team Meetings

The last procedural challenge plaintiff raises is that Ms. Rosinsky was not included as an equal participant in Alex's IEP meetings. The ALJ found that as Ms. Rosinsky actively participated in the IEP meetings, voiced her concerns, made recommendations, asked questions, provided input, requested and successfully obtained the attendance of an IEP facilitator, there was no evidence to support her allegation that the District failed to include her as an equal participant in IEP meetings during the 2007-2008 school year. (Decision at 12.) Plaintiff contends that the ALJ improperly elevated form over substance in making this finding, asserting that she was denied meaningful participation. She claims the following is evident in the record and supports her position: (1) the District was unwilling to accommodate her availability in scheduling IEP meetings; and (2) the District was uncompromising with respect to the programming to be included in Alex's IEP and resisted her suggestions to the point of "effectively eliminat[ing] the Parent from certain decisions

24

regarding the substantive aspects of Alex's IEP . . . ." (Pl.'s Br. in Opp. at 13.) Plaintiff makes much of the fact that the District's witness testified that decisions were made by a consensus of the District's staff and that the input Ms. Rosinsky provided was at odds with this consensus. (*Id*.) (*citing* Tr. 79-80, Hearing Ex. 4.) She also points to the comments of District personnel that she was asking for a "Cadillac" program but the District was only required to provide a "Chevy" program. (Pl.'s Br. in Opp. at 12.)

The ALJ's findings regarding the extent to which Ms. Rosinsky participated in the IEP meetings are unassailable. Plaintiff's claim that the District did not accommodate her schedule is unavailing, as it is clear that she actually attended all of Alex's IEP meetings. I must therefore consider whether the ALJ was in error for not finding that Ms. Rosinsky was effectively sidelined at the meetings to the point that she was unable to participate, and if so, whether this resulted in a substantive denial of a FAPE.

The IDEA provides "an opportunity for the parents of a child with a disability . . . to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child . . . ." 20 U.S.C. § 1415(b)(1); *see also* 20 U.S.C. § 1414(d)(1)(B)(i) (defining IEP team to include parents of child with disability); 34 C.F.R. § 300.322. The Seventh Circuit has observed that the IDEA "assures the parents an active and meaningful role in the development or modification of their child's IEP." *Hjortness*, 507 F.3d at 1064 (citing *Bd. of Educ. v. Ross*, 486 F.3d 267, 274 (7th Cir. 2007)).

The problem with plaintiff's assertion that she was not part of the consensus arrived at by the IEP team is that IEP team consensus does not require parental agreement in order to satisfy the IDEA. *See Hjortness*, 507 F.3d at 1065-66 (noting prior holding in *Ross*, 486 F.3d at 274-75, that

25

"just because the placement was contrary to the parents' wishes, it does not follow that the parents did not have an active and meaningful role in the modification of their daughter's IEP, as required by the IDEA."); *see also Tammy S. v. Reedsburg Sch. Dist.*, 302 F. Supp. 2d 959, 976 (W.D. Wis. 2003) (noting that IDEA's procedural protections do not require that a parent must agree to a proposed placement decision, regardless of the extent of the parent's participation in IEP meetings) (citations omitted). The record demonstrates that Ms. Rosinsky attended all of the IEP meetings for the 2007-2008 school year, (Hearing Exs. 1, 12, 21, 22; Tr. 78, 343.), and actively participated in the meetings by voicing her concerns, making recommendations, asking questions and providing input. (Hearing Exs. 1, 12, 21, 22, 59; Tr. 77, 141-42, 206-07, 230-32.) I conclude that Ms. Rosinsky participated sufficiently in the development of Alex's IEP to satisfy the IDEA's procedural requirements.

### D. Adequacy of Alex's IEP

Plaintiff also contends that Alex's IEP was inadequate for failing to include measurable goals for Alex and also for not providing him the opportunity to participate in extracurricular activities.

#### 1. Measurable Goals

The ALJ determined that the annual goals outlined in Alex's IEP "were appropriately developed to meet his unique educational and vocational needs, as required by law." (Decision at 14.) Plaintiff asserts that the IEP lacked measurable goals to address Alex's identified deficiencies. For example, she argues that while the IEP set a goal for Alex regarding how to ask for help, it did not speak to his difficulty in determining whom to ask for help. She also claims that a number of

26

Alex's other deficiencies were not specifically addressed in the IEP,[8] and asserts that the IEP's goal of "increasing independence in the community" is too vague and not a panacea for all of Alex's challenges.

The IDEA requires that an IEP include "a statement of measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and . . . meet each of the child's other educational needs that result from the child's disability . . . ." 20 U.S.C. 1414(d)(1)(A)(II); *see also* 34 C.F.R. § 300.320(a)(2). Alex's December 2007 IEP included three annual goals: (1) increasing his independence in the community in a variety of settings by complying with adult directives with 85% accuracy; (2) working consistently for 30 minute blocks of time followed by short breaks and repeating the cycle at job sites with fewer prompts; and (3) with fading cues, requesting help or requesting a specific item at work sites when confronted with an asking opportunity from a designated person. (Hearing Ex. 1 at 5-60, 5-61, 5-62.) The ALJ noted that the IEP contained these goals, along with the fact that Alex's reevaluation report and IEP described several areas of strengths and needs, including the areas of work experience, speech and language, physical education, math, vocational studies, social studies and science. (Decision at 14.)

Even though plaintiff may have identified deficiencies in the November 2007 evaluation which were not addressed in the goals set in the IEP, it does not follow that such a failure amounts

---

[8] Plaintiff asserts that despite Alex's noted deficiencies in social skills and self-sufficiency, there were no goals in these areas. Plaintiff also notes that there were no specific goals aimed at addressing Alex's deficiencies identified in November 2007 evaluation (i.e., his significant delays in spelling, math, comprehension and writing).

27

to a substantive violation of the IDEA. The same is true regarding the fact Ms. Rosinsky identified Alex's difficulty determining *whom* to ask for help, as the IEP did set goals for Alex in terms of him identifying *when* to ask for help. "To be substantively appropriate, the IEP must be formulated so that [the student] would receive the 'basic floor of opportunity [, consisting of] access to specialized instruction and related services which are individually designed to provide educational benefit to [him].'" *Hjortness*, 507 F.3d at 1064. (quoting *Rowley*, 458 U.S. at 201); *see also Stanley C. v. M.S.D. of Southwest Allen County Schools*, 628 F. Supp. 2d 902, 961 (N.D. Ind. 2008) (citations omitted) ("Although a violation of the IDEA, a failure to include measurable goals, like other procedural defects, does not amount to a denial of a FAPE unless it also significantly impedes the parents' opportunity to participate in decision making regarding the provision of a FAPE, impedes the student's right to a FAPE, or causes a deprivation of educational benefits to the student."). The ALJ considered the three goals of the IEP in light of Alex's evaluation history and concluded that as the IEP addressed many of the areas in which Alex needed to improve, the annual goals had been developed appropriately. While the goals may not have addressed every area plaintiff would have liked, they were measurable and were formulated to provide Alex a "basic floor of opportunity."

## 2. Services that would allow participation in extracurricular activities

Plaintiff also claims the IEP is deficient for failing to provide Alex opportunities to participate in extracurricular activities. Part of plaintiff's argument is that what the District calls "extracurricular activities" were merely events at which Alex was a spectator and not an active participant, or they were activities that were part of his curriculum. Further, plaintiff claims that the District failed to provide sufficient support services to permit Alex to participate in extracurricular activities. The District responds by claiming that nothing in Alex's IEP required extracurricular

28

activities, as the IEP team never determined that such activities were necessary for Alex to receive educational benefit.

The ALJ noted that the IEPs in effect during the 2007-2008 school year state that Alex would be able to participate in extracurricular and nonacademic activities with non-disabled students. (Decision at 13.) (citing Hearing Exs. 1, 12.) The ALJ cited evidence from the record indicating that the District offered Alex opportunities to participate in the homecoming parade, basketball and football games, a "Snowball" dance, volleyball games and the Victory Olympics. (*Id.*) (citing Hearing Ex. 51; Tr. 344.) The decision also referenced the testimony of Alex's teacher and the District's Associate Director of Special Education, who both testified that the IEP contained sufficient supports and services to allow Alex to participate in extracurricular activities. (*Id.*) (citing Tr. 82, 245, 346.)

Under the IDEA, an IEP must include a statement of the special education, related services and supplementary aids to be provided in order to allow the student to participate in extracurricular activities. *See* 20 U.S.C. § 1414(d)(1)(A)(IV); *see also* 34 C.F.R. § 300.320(a)(4); *cf. Rettig v. Kent City Sch. Dist.*, 788 F.2d 328, 332 (6th Cir. 1986) (holding that if a student is unable to benefit educationally from extracurricular activity, the school district is not required under the IDEA to provide such a service to the student). Here, plaintiff misreads Alex's IEPs for 2007-2008 to require extracurricular activities, as they plainly only indicate that Alex would be provided the opportunity to participate in such activities. Further, the IEPs do identify what support services would be available to Alex, though they were not specific to particular extracurricular activities. This is because the IEP team did not know what extracurriculars Alex would participate in at the time the

29

IEP was formulated. (Tr. 82.) I see no reason to disrupt the ALJ's finding on the sufficiency of the extracurricular activities available to Alex.

### E. Implementation of the IEP

Plaintiff's next set of challenges to the ALJ's decision is that the ALJ erred in determining that Alex's IEP was appropriately implemented. According to plaintiff, the following three aspects of the IEP were not implemented satisfactorily: (1) the requirement that Alex wear his ID; (2) the requirement that the District schedule electives of Alex's choice; and (3) the requirement that the District notify the parent of Alex's progress towards the IEP's goals.[9]

### 1. ID Tag at School

Alex's IEP stated that he would have "[u]se of adaptive clip-type holder for [his] ID tag, which is to be worn daily in all school related activities." (Hearing Ex. 1 at 5-57.) While the ALJ found this provision to be related to the fact that beginning in the 2007-2008 school year the District instituted a new policy requiring high school students to wear IDs, plaintiff contends this provision was in the IEP not as a reflection of District policy, but as a transitional goal to allow Alex to become accustomed to wearing an ID in the workplace.

In reaching her conclusion that the District appropriately and adequately implemented the IEP provision requiring Alex to wear his ID during all student activities, the ALJ noted that Alex's teacher had observed that Alex's ID lanyard was distracting and bothering him. (Decision at 15.) Based upon her observations, Alex's teacher convinced the school administration to exempt Alex from school policy mandating the wear of the ID. The ALJ noted that Alex's teacher testified that

_____

[9]Plaintiff also includes argument in her response brief about a failure on the part of the District to implement the purported IEP requirement regarding extracurricular activity participation, which the Court has already addressed above.

she modified lanyards and clips to allow Alex to wear his ID at all times while at school and at work sites in the community. Plaintiff contends that because Alex had not worn his ID tag since January 2008, and the IEP called for him to wear one in "all school related activities," summary judgment for the District is inappropriate.

The record reflects the fact that on November 16, 2007, Ms. Rosinsky wrote Alex's teacher inquiring about marks on his neck, which she attributed to his ID card lanyard. (Hearing Ex. 29.) She further asked that he be permitted to wear his ID differently. Alex's teacher responded to Ms. Rosinsky, noting: "Alex was playing with his lanyard a lot yesterday, rolling it on his neck, back and forth. We can give him a clip for his ID, we'll be sure to have him take it off . . . today if his neck is hurting." (*Id.*) The plaintiff has not produced sufficient evidence to warrant upsetting the ALJ's conclusion that the IEP provision relating to the ID card was appropriately implemented.

### 2. Electives of Alex's Choice

Plaintiff next contends that the ALJ erred in finding that the District adequately and appropriately implemented the IEP provision regarding electives of choice by considering Alex's elective preferences for the second semester of the 2007-2008 academic year. The ALJ noted that the range of electives available to Alex was limited in part by the number of hours he was spending outside of school for work experience and community-based instruction. (Decision at 14.) (citing Hearing Exs. 48, 49; Tr. 160.) For the reasons stated above regarding plaintiff's claim that insufficient notice was given to Ms. Rosinsky regarding the selection of Alex's elective classes, I conclude that the plaintiff has failed to demonstrate how the ALJ's decision that the IEP was appropriately implemented was in error.

### 3. Notification to parent of Alex's progress towards goals

The final challenge to the way in which the District implemented Alex's IEP is the claim that the District failed to notify Ms. Rosinsky of Alex's progress towards the December 2007 IEP's goals in Alex's first semester progress report. The December 2007 IEP was not implemented until January 2, 2008 and was in effect for only 12 school days of the first semester. Alex's teacher did not complete his first semester progress report until January 18, 2008 and reported Alex's progress under the previous IEP's goals, as they had been effective for almost all of the semester. The teacher also referenced the new goals in her narrative comments, but did not assess his performance under them. (Hearing Ex. 25.) Thus, plaintiff faults the District for not including a report of Alex's progress over 12 days under the freshly-minted goals.

The ALJ concluded otherwise, finding that the District reasonably and appropriately implemented the progress report provision of the IEP by providing Ms. Rosinsky a report on Alex's progress for the first semester under the previous IEP's goals. The ALJ also found significance in the fact that Ms. Rosinsky was provided a report on Alex's progress towards the new goals on June 9, 2008. (Hearing Ex. 42.) Plaintiff's attempt to elevate this deviation from the IEP to an actionable claim under the IDEA is unconvincing. The ALJ did not error in concluding that the District's decision to evaluate Alex's progress on goals that were in place for four months instead of 12 days was sensible, as an evaluation under the new standards on such a small amount of data would have yielded results of questionable worth.

### F. Reevaluation of Alex

Plaintiff also contends that the District's reevaluation of Alex was deficient under the IDEA. The ALJ disagreed, finding that the District's reevaluation of Alex was appropriate, including the

32

assessments the District administered, the information included in the evaluation report and the District's eligibility determination. (Decision at 11.)

The IDEA places upon the District the obligation to evaluate and reevaluate students with a disabilities. 20 U.S.C. § 1414(a). The statute requires that the District follow certain evaluation procedures. 20 U.S.C. §§ 1414(b), 1415; 34 C.F.R. § 300.304; *see also* Wis. Stat. § 115.782. Where a school district fails to follow proper evaluation procedures for a student, such a shortcoming is not actionable where it did not amount to a denial of a FAPE. *Hjortness*, 507 F.3d at 1065.

### 1. KABC-2 Testing

In evaluating Alex's intellectual functioning the District employed the Kaufman Assessment Battery 2 ("KABC-2") test, and for his adaptive functioning it assessed him with the Adaptive Behavior Assessment System ("ABAS II") test. (Hearing Ex. 21 at 5-41.) Plaintiff alleges in the Amended Complaint that the ALJ erred in finding the District properly evaluated Alex using both testing methodologies, though she does not appear to address the propriety of the KABC-2 test in her brief in response to the District's motion for summary judgment. Instead, she faults the District for failing to teach Alex the skills tested, such as doing math without a calculator and writing a sentence or paragraph about a picture. (Pl.'s Br. in Opp. at 29.) The ALJ found the District's use of the KABC-2 test appropriate given testimony of the District's expert, who noted that although the test was designed for children up to 18 years of age, it was an appropriate tool for assessing the intellectual functioning of persons with Fragile X. (Decision at 11.) Plaintiff has provided nothing to call into question the propriety of the ALJ's finding regarding the District's use of the KABC-2 test. The ABAS II test is addressed below.

33

### 2. OHI Checklist

It is undisputed that the OHI checklist, which is part of the reevaluation, contained three errors. (Hearing Ex. 21 at 5-42; Hearing Ex. 22.) It erroneously indicated: (1) that there were no medical records on file regarding Alex's Fragile X syndrome; (2) that Alex was not on medication for Fragile X syndrome; and (3) that the family/child had followed through with professional treatment plans. (*Id.*) The ALJ noted these errors, but found them inconsequential in that they did not adversely impact Alex's eligibility determination, did not render the reevaluation invalid or inappropriate, and did not constitute a denial of FAPE to Alex. (Decision at 11.)

On the issue of the OHI checklist, as with other aspects of the reevaluation, plaintiff contends that the issue is not eligibility but that one cannot craft an appropriate IEP based upon erroneous, flawed or incomplete data. As noted above, however, the ALJ's finding on the impact of the erroneous information contained on the OHI was not limited to the issue of eligibility, as she specifically found that it did not render the re-evaluation invalid or inappropriate and did not constitute a denial of a FAPE. Because there is insufficient information in the record to suggest that the flaws in the OHI checklist fundamentally corrupted the re-evaluation and denied Alex a FAPE, I defer to the ALJ's finding.

### 3. Special Education Program Support Teacher's Conclusions

The ALJ determined that Alex's program support teacher's conclusions were accurate and that the reevaluation was appropriate and complied with the IDEA. (Decision at 11, 18.) Plaintiff asserts that the ALJ's conclusion was erroneous for a lack of documentation in the reevaluation regarding Alex's reading level and his ability to write his personal information, along with deficiencies in the ABAS II test. On the question of Alex's reading level, the program support

34

teacher, Kathryn Geimer-Chojnacki, indicated in the reevaluation that "He can read and write personal information, daily classroom schedule, and various common street signs seen, but would have difficulty completing more complex forms, or reading important documents such as class registration or school conduct policies." (Hearing Ex. 21 at 5-36.) Although she did not assign a reading level to Alex, the conclusions on Alex's reading abilities provided by his program support teacher are not so manifestly erroneous as to warrant disturbing the ALJ's decision finding them satisfactorily correct.

Plaintiff's argument regarding Alex's abilities to write his personal information is also unconvincing. Plaintiff makes too much of the fact that Geimer-Chojnacki noted that Alex could "write personal information," yet testified that on the day she worked with him he was only able to type his personal information (other than his name). (Pl.'s Br. in Opp. at 32.) But Geimer-Chojnacki explained that she thought Alex could "probably write his address, but because it's large in the forming of the letters, it's easier for him to type it–He can do it both ways, but it's easier and more legible when he types it." (Tr. 145-46.) The ALJ found her testimony credible, and the Court can discern no reason to find otherwise. While plaintiff is convinced that Geimer-Chojnacki's testimony about Alex's writing abilities necessitates a finding that the reevaluation was fundamentally flawed, this does not follow. The reevaluation makes it clear that Alex had very limited abilities in writing.

This leaves the District's use of the ABAS II test, which plaintiff contends was flawed for not testing Alex in social skills, health and safety, home living skills, leisure and work. (Pl.'s Br. in Opp. at 31.) At the due process hearing, Geimer-Chojnacki, who administered the ABAS II assessment, testified that she did not specifically evaluate social skills, health and safety, home

35

living skills, leisure and work, but did record other scores. (Tr. 146-48.) These other scores were noted in the "Adaptive Functioning" section of the Impairment Checklist and in another section of the evaluation. (Hearing Ex. 21 at 5-36, 5-41.) She only recorded three ABAS II scores on the checklist as that was all that was required to indicate that Alex qualified as cognitively impaired on the basis of the adaptive functioning; she did not perform testing in other areas given the other information about Alex's abilities contained in observations by others. (Tr. 148.) Geimer-Chojnacki's conclusion that testing every subset would be redundant based upon other information available to her, and her decision to only list the testing results from three subsets on the checklist does not call into question the validity of the reevaluation.

### 4. Tests that Required Knowledge of Skills Alex Hadn't Been Taught

The ALJ found that the District's use of evaluative testing which tested Alex's knowledge of skills he had not been taught was appropriate. Plaintiff appears not to fault the testing so much as she does the District's failure to teach Alex the appropriate skills according to curriculum standards and benchmarks. (Pl.'s Br. in Opp. at 29.) As noted above, plaintiff argues that Alex should have been taught how to do math without a calculator and how to write a sentence or paragraph about a picture. The testimony of the District's witnesses at the hearing made it clear that the tests are intended to capture a student's potential and compare the student to his peers. (Tr. 304-05, 323-24.) Because plaintiff has failed to show how the testing was inappropriate, the ALJ's finding will stand.

Based on the above, the ALJ properly concluded that the District fulfilled its obligation to reevaluate Alex, to include administering the appropriate assessments.

36

### G. Transition Services

The ALJ found that the District developed and implemented a transition program that improved Alex's employability skills and supported his post-secondary transition goals. (Decision at 18.) The District argues this finding was appropriate given the testimony of Gantz and Dr. Van Haren, who testified that Alex's IEP, including his transition programming, provided him a FAPE. Alex's teacher testified that the transition programming had helped Alex work more hours, work an hour or more without a break, and do more with fewer verbal prompts for a longer period of time. (Tr. 354-55, 370.)

Plaintiff contends that the ALJ's conclusion was erroneous for several reasons. First, she argues that the goals in Alex's IEP were insufficiently specific regarding his employability skills and life skills. In support of this argument she points to the testimony of her expert, Dr. Elizabeth Berry-Kravis, who considered the goal of "increasing independence in the community" too broad to be meaningful. Plaintiff's second criticism relates to the ALJ's consideration of the testimony of the District's expert, Dr. Van Haren, as plaintiff asserts that Dr. Van Haren failed to designate facts in support of her conclusion that a year from his graduation Alex's progress would continue or greatly surpass his rate of progress while a student at West High. According to plaintiff, the ALJ should have done more to ensure that Van Haren's opinion that Alex would be able to progress from working approximately 10 hours per week to 15-20 hours per week in one year had some factual basis before "qualifying" her as an expert.[10] Next, plaintiff asserts that the District "excluded transition agencies from the IEP meetings in December and therefore lacked information as to what

---

[10]Plaintiff's claim that the ALJ erroneously qualified Dr. Van Haren as an expert is strange, given the fact that in Wisconsin a hearing officer in proceedings under the IDEA "is not bound by common law or statutory rules of evidence." Wis. Stat. § 115.80(5).

type of goals and services Alex should be receiving to transition to post-secondary activities." (Pl.'s Br. in Opp. at 39.)  Finally, plaintiff faults the District for failing to offer any specific hard data on progress Alex has made, noting that his teacher's testimony that Alex continued to have difficulty with money skills despite the District's efforts to improve them for the last five to seven years is incongruous with the District's general statements of Alex's "progress."

The IDEA requires that the IEP in effect when a child is 16 years old, and all subsequent IEPs, include "appropriate measurable postsecondary goals based on age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills," and that it describe the "transition services (including courses of study) needed to assist the child in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb); *see also* 34 C.F.R. § 300.320(b).  The statute does not grant the school district any discretion regarding whether to include a transition plan in the IEP.  *Ross*, 486 F.3d at 276 (*citing Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996)).  A district's failure to include a transition plan in the IEP, while procedurally defective, is not a substantive violation of the IDEA.  *Id*. ("The failure of the plan to discuss transition is, however, a procedural flaw, not a substantive one: no one would be complaining about the language of the plan if the District had in fact been providing transitional services to [the student]. The important question is therefore whether the District failed to give [the student] something to which she was entitled.").

The ALJ found that both of the IEPs in effect for Alex during the 2007-2008 academic year contained detailed transition statements, which included suggested courses of study, instruction, employment, post-school adult living, daily living, community experiences, functional vocational assessment, and related services.  (Decision at 16.)  Further, because the December 2007 IEP

38

contemplated that Alex "will be able to hold a 15-20 hour-per-week part-time supported employment job in a community setting utilizing his strengths, such as categorizing or sorting skills, and have limited customer interaction," (Hearing Ex. 1.), the ALJ reasoned that the IEPs contained "measurable post-secondary goals." (Decision at 16.) Based upon the record, the ALJ concluded that Alex was out of the classroom four or five times per week at job sites in the community as part of the transition program, and that he was involved in daily living, community and recreational/leisure activities, along with vocational experiences, in the community. (*Id*.) (citing Hearing Ex. 1.)

The ALJ also cited the testimony of Alex's work experience coordinator, Leslie Hanshew, who testified that he had made progress during the 2007-2008 academic year. (Tr. 370.) Hanshew noted that Alex could stay on task longer in a work setting without a break, was adjusting to new tasks, and was focused on a task from start to finish. (Tr. 370-71.) The ALJ further considered the fact that Alex's special education teacher, Andrea Solper, testified that he had made progress during the school year in areas relating to his employability skills. (Tr. 354.) Also significant to the ALJ was the testimony of Dr. Van Haren and Gantz, who testified that the transition programming allowed Alex to increase his employability skills and supported his post-secondary goals. (Tr. 100-01, 279-82, 331-32.) In Dr. Van Haren's opinion, the transition plan was comprehensive and complied with the requirements of the National Transition Center. (Tr. 328-30.)

Plaintiff's expert witness on Fragile X syndrome, Dr. Berry-Kravis, testified that it was her opinion that Alex's transition program did not include a strong enough variety of work settings or an extensive list of different kinds of job skills. (Tr. 405.) The ALJ discounted this testimony, however, as she found that Dr. Berry-Kravis was not a special education expert, and her credibility

was diminished by the fact that she had not reviewed Alex's most recent transition assessment and was not able to confirm that she had done a complete review of his education records. (Decision at 17.) (citing Tr. 415, 420.)

There is insufficient evidence in the record to conclude that the ALJ's finding regarding the transition services provided Alex was erroneous. The testimony of Dr. Van Haren, Gantz, Hanshew and Solper is all consistent with Alex's progress on the job and the role of the IEP's transition services in making him more employable and proficient at his life skills. While Dr. Berry-Kravis thought the program insufficiently detailed on work settings and job skills, the ALJ properly decided to place more weight on the testimony of the District's witnesses given Dr. Berry-Kravis' lack of expertise in special education and the fact she was relatively unfamiliar with the object of her criticism, as she had not reviewed Alex's most recent transition assessment or many of his other records. Because the ALJ's finding is supported by the record, I will not disturb it.

## H. Appropriate Placement

The ALJ also found that the District provided appropriate placement for Alex that included adequate life skills and transition programming, and that the District considered Alex's preferences. This finding is closely related to the ALJ's determination that the District developed and implemented an appropriate transition program, as discussed above. Plaintiff challenges the ALJ's conclusion on the basis of Gantz's testimony regarding the lack of specific goals in Alex's IEP addressing the development of employability and life skills, along with his admission that none of the goals directly supported Alex's goal of living in a group home. Finally, plaintiff alleges that in its effort to minimize the use of outside service providers, the District did not consider Alex's

40

preference, as expressed by Ms. Rosinsky, of attending Paragon Community Services two or three afternoons per week.[11]

The record supports the ALJ's determination that the District provided Alex appropriate educational placement. The Court has already found that the ALJ did not err in finding the goals contained in Alex's IEP appropriate, so I need not address plaintiff's argument that because Alex's goals were insufficient, so too was his placement. The evidence adduced at the hearing demonstrates that Alex participated in the transition and life skills programming by working at job sites, participating in community-based instruction and participating in life skills curriculum. (Hearing Exs. 48-49, 54-55; Tr. 348.)

The record does not support her claim that the District did not consider Alex's preferences in his placement. Ms. Rosinsky communicated Alex's desire to participate two or three afternoons per week in Paragon's program, and even expressed a willingness to split the $10 hourly cost of such services with the District. (Hearing Ex. 3.) The December IEP noted the request that the District contract with a community service provider for community activities, but rejected the suggestion "as district programming can adequately provide community activities." (Hearing Ex. 1 at 5-66.) As noted above, the record provides ample evidence of the fact that Alex did participate actively in community activities provided by the District. The ALJ's finding was not clearly erroneous.

---

[11]Plaintiff also contends that the District failed to consider Alex's preferences regarding elective courses, which was addressed above.

41

### I. FAPE that Provided More than Minimal Educational Benefit

The ALJ surveyed the record as a whole and concluded that Alex progressed during the 2007-2008 school year and that the District had provided him a FAPE. Plaintiff's efforts at avoiding summary judgment in favor of the District on this issue center around her claim that the ALJ erroneously excluded from consideration evidence relating to the Wisconsin Extended Grade Band Standards ("WEGBS"), which she contends would be relevant in answering the question of whether the District supplied Alex a FAPE that provided more than a minimal educational benefit. But as already noted, the fact that the District has now adopted the WEGBS to evaluate children does not mean that the evaluations performed prior to their adoption were of no value.

A child receives a FAPE when his IEP is reasonably calculated to confer educational benefit. *Rowley*, 458 U.S. at 203-04. The ALJ based her decision on the evidence in the record which indicated that Alex had progressed during the 2007-2008 school year. (Hearing Ex. 25, 42; Tr. 284, 354, 370.) For example, this evidence indicated that Alex progressed in his work skills, as he was able to do more with fewer verbal prompts for a longer period of time, he could work for longer periods of time with no break for an hour or more. (Tr. 354-55, 370.) The record does not support a finding that the ALJ erred in determining the District supplied Alex with a FAPE. Accordingly, the ALJ's determination that the District did not violate the IDEA will be affirmed. It follows that Plaintiff is not entitled to compensatory education as a form of relief.

### CONCLUSION

While the Court is sympathetic to plaintiff's desire to ensure that Alex is offered the best possible education and transition services, plaintiff has failed to meet her burden of showing that

the ALJ's findings and conclusions were in error.  Further, plaintiff also fails to provide sufficient justification to warrant taking more discovery and introducing additional evidence in this judicial review of an administrative process.

**THEREFORE IT IS ORDERED** that plaintiff's motion for leave to conduct more discovery and for leave to supplement the administrative record is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **GRANTED** and this matter is **DISMISSED**.  The Clerk shall enter judgment accordingly forthwith.

Dated this ___9th___ day of October, 2009.


　　　　　　　　　　　　　　　　　　　　_ s/ William C. Griesbach_____
　　　　　　　　　　　　　　　　　　　　William C. Griesbach
　　　　　　　　　　　　　　　　　　　　United States District Judge

43